David J. LYONS, commissioner of insurance for the State of Iowa and receiver for the Iowa Trust, Plaintiff,

v.

JEFFERSON BANK & TRUST,
a Colorado corporation,
Defendant.

Civ. A. No. 91–B–2245.

United States District Court,
D. Colorado.

May 8, 1992.

Edwin S. Kahn, Walter W. Garnsey, Jr., Kelly, Haglund, Garnsey & Kahn, Denver, Colo., Anuradha Vaitheswaran, Asst. Atty. Gen., Iowa Securities Bureau, Des Moines, Iowa, for plaintiff.

Philip E. Lowery, Marcella T. Clark, Lowery, Lamb & Lowery, P.C., Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BABCOCK, District Judge.

This is an action in equity filed in December, 1991. Plaintiff seeks imposition of a constructive trust and return of funds. That claim arises out of an elaborate securities kiting scheme orchestrated by Steven D. Wymer.

Following hearing on January 21 and 22, 1992, I granted plaintiff's motion for a preliminary injunction to preserve and set aside the corpus of the claimed constructive trust. *See, Lyons v. Jefferson Bank & Trust,* 781 F.Supp. 1525 (D.Colo.1992). The parties have stipulated that, pursuant to Fed.R.Civ.P. 65(a)(2), the evidence admitted at the preliminary injunction hearing is to be considered a part of the record for trial on the merits. Since January 23, 1992, $42,843,614.13, together with interest earned thereon since November 25, 1991, has been held in an escrow at Norwest Bank of Denver (formerly United Bank of Denver). Trial on the merits of plaintiff's claim was held from April 27, 1992 through May 5, 1992.

Resolution of this dispute and the disposition of these funds turns on whether plaintiff has met his burden of tracing Iowa Trust monies from its custodial account with Bankers Trust Company of Des Moines, Iowa to defendant and, if so, whether equity should convert defendant into a trustee. I find these issues for plaintiff and against defendant.

## I.

## FINDINGS OF FACT

The parties are diverse. Therefore, jurisdiction is proper under 28 U.S.C. § 1332. The defendant resides in the District of Colorado. Thus, venue is proper under 28 U.S.C. § 1391.

The Iowa Trust is a trust organized under the laws of Iowa with its principal place of business in Iowa. It was formed in January, 1989 to allow various political subdivisions within Iowa to pool their funds for investment purposes. The beneficiaries of the Iowa Trust include 88 cities, counties, and other political entities. Its assets include pension funds and other funds used by the governmental entities for essential services, payroll, and public works projects.

Plaintiff David J. Lyons is the Iowa Insurance Commissioner. He was appointed receiver for the Iowa Trust on December 19, 1991 by the Iowa District Court for Polk County. The court charged him with marshalling, recovering, and distributing the trust's assets.

Defendant Jefferson Bank & Trust is a Colorado corporation and bank. Its principal place of business is in Lakewood, Colorado.

### A. *The Iowa Trust Trades*

In early 1990, the Iowa Trust entered into an investment management agreement with Denman & Co. (Denman), a corporation solely owned and controlled by Steven D. Wymer (Wymer). Subsequently, Institutional Treasury Management, Inc. (ITM), another company solely owned and controlled by Wymer, succeeded Denman. Pursuant to the management agreement, Wymer directed investments for the Iowa Trust and he had authority to order trades and transfers for its account. The Iowa Trust also entered into a custodian agreement with Bankers Trust Company of Des Moines, Iowa, under which Bankers Trust held the Iowa Trust's cash and securities for investment upon Wymer's directions.

On November 21, 1991, at Wymer's direction, the Iowa Trust bought $40 million principal (face) amount of 7.75% 2/15/95 United States Treasury Notes (the 1995 Notes). The 1995 Notes were placed in its custodian account at Bankers Trust.

On November 25, 1991, Wymer directed execution of each of the following transactions:

1. Bankers Trust wire transferred the 1995 Notes free (without payment) to ITM's trading account with First Interstate Bank of Denver (FIB);

2. ITM sold the 1995 Notes and deposited the proceeds of $42,843,614.13 into ITM's securities clearing demand checking account with FIB;

3. Together with additional funds in the checking account, ITM used the $42,843,614.13 from the sale the 1995 Notes to purchase $41 million principal amount of 8.625% 8/15/94 United States Treasury Notes (the 1994 Notes) at a price of $44,824,531.25;

4. FIB wire transferred the 1994 Notes free to Refco Securities, Inc. ($5 mm of the notes at 2:25 p.m. and $36 mm at 3:29 p.m.);

5. Between 3:29 p.m. and 3:55 p.m., having credited the 1994 Notes to defendant's account, Refco Securities purchased as principal the 1994 Notes from defendant's account for $44,786,093.75 and placed the cash in defendant's account at Refco Securities;

6. At 3:55 p.m. Refco Securities wire transferred $44,786,093.75 from defendant's account at Refco Securities to defendant's account with Refco Capital Corporation;

7. Refco Capital then wire transferred $44,927,031.25, which sum included the $44,786,093.75 derived from the sale of the 1994 Notes, to defendant.

*See*, Exhibits 29 and 81. (A graphic summary of these transactions is attached to this opinion as Appendix 1). There is no evidence that plaintiff willfully approved these transactions.

It is clear from the evidence, both direct and circumstantial, that at the close of business on November 25, 1991 defendant held $42,843,614.13 of Iowa Trust's funds derived from the sale of the trust's 1995 Notes.

Notwithstanding these facts, defendant attacks plaintiff's tracing with its theory of "the two minute gap." Defendant points to a transfer from Refco Securities of $41 million face amount of 8.625% 8/15/94 Notes (the Shearson Notes) to Dean Witter at 3:27 p.m. on November 25, 1991. Further, $36 million of the 1994 Notes did not arrive at Refco Securities from FIB until 3:29 p.m. on that day. *See, infra*, p. 7, ¶ 6.

Thus, defendant contends that it received the proceeds from the sale to Dean Witter and not the proceeds of the sale of notes traceable to the Iowa Trust because Refco Securities could not sell what it did not yet have. However, I find that there were two distinct sales of identical blocks of treasury notes on November 25, 1991. *See, infra*, pp. 983–85. Refco Securities sold notes that it purchased on November 22, 1991 to Dean Witter. *See*, Exhibits 80 and 82. Refco Securities also bought the 1994 Notes from defendant's account. *See*, Appendix 1 and Exhibit 81. The purchase price Refco Securities paid into defendant's account and the wire-out of cash to defendant's account at Refco Capital are identical. Therefore, I find that it was the proceeds from this second transaction that were wire-transferred to defendant's Refco Capital account and then to defendant.

Defendant's president Maurice Grotjohn testified at the preliminary injunction hearing that defendant moved the funds traceable to the Iowa Trust in and out of several securities and held them in its investment account at the Federal Reserve Bank of Kansas City at the time of the hearing. Thus, I found at the preliminary injunction hearing that defendant held funds and securities traced directly from the 1995 Notes from November 25, 1991 to January 22, 1992. However, at the preliminary injunction hearing and at trial, plaintiff failed to prove that defendant profited from trading funds subject to the constructive trust—the $42,843,614.13 derived from the sale of the 1995 Notes.

By injunction dated January 22, 1991, I ordered that funds and securities in the amount of $43,173,614.13 be segregated into an escrow account with United Bank of Denver, now Norwest Bank of Denver. The amount deposited i to the escrow account included the proceeds realized from the sale of the 1995 Notes, plus interest on that amount of $330,000 from November 25, 1991 to January 22, 1992. I further find that defendant continues to hold funds and securities traced directly from the 1995 Notes.

### B. *The Alleged Jefferson Trades*

In March, 1988 and subsequently in December, 1989, defendant also entered into investment management agreements with Wymer and his companies. By those agreements and through a course of conduct, Wymer had authority to trade and transfer funds and securities for defendant's benefit, including repurchase and reverse repurchase transactions (financing arrangements). Indeed, the broker-dealers executing the transactions evidenced in this case executed trades in defendant's name upon only Wymer's oral instructions without independent verification.

Defendant claims that on November 18, 1991 it purchased the Shearson Notes through Wymer for $44,859,765.62. Defendant claims that it purchased the Shearson Notes through Shearson Lehman Brothers (Shearson) as broker and that these notes were wire-transferred to its account at Refco Securities on November 18, 1991. Defendant also claims that, to generate the funds to purchase the Shearson Notes, it sold on November 18, 1991 (1) $20 million face amount of 7.25% 7/15/93 Notes that it claims to have purchased on November 5, 1991 and (2) $22 million face amount of 7.75% 2/15/95 Notes that it claims to have purchased on November 12, 1991. Defendant further claims that (1) in order to purchase the 7.25% 1993 Notes on November 5, 1991, it sold $21 million face amount of 7.375% 5/15/96 Notes and/or $21 million face amount of 7.0% 5/15/94 Notes and (2) in order to purchase the 7.75% 1995 Notes on November 12, 1991, it sold $22 million face amount of 7.5% 1/31/96 Notes.

Contrary to defendant's claims, the credible evidence is overwhelming that:

1. on November 18, 1991, Refco Securities received the Shearson Notes from Shearson but, upon Wymer's instructions, credited those notes to the account it knew as the "State of Wyoming" (It is undisputed that the State of Wyoming never authorized Wymer to open an account in its name at Refco Securities);

2. on November 18, 1991, Refco Securities wire-transferred $44,859,765.62 to

Shearson in payment for the Shearson Notes;

3. none of defendant's money was used to purchase the Shearson Notes on November 18, 1991 or at any time thereafter;

4. Refco Securities financed the purchase of the Shearson Notes by the State of Wyoming account through a series of reverse repurchase and repurchase agreements;

5. on November 22, 1991, Refco Securities closed the then open reverse repurchase agreement and purchased the Shearson Notes as principal; and,

6. Refco Securities then sold the Shearson Notes for $44,811,718.75 to Dean Witter on November 22, 1991 with a November 25, 1991 settlement date.

*See,* Exhibits 80 and 82. Indeed, defendant's president, Maurice Grotjohn, testified that there is no evidence that any Jefferson Bank & Trust money was used to purchase the Shearson Notes on November 18, 1991.

Contrary to defendant's claims, I also find from the overwhelming credible evidence that:

1. defendant neither owned nor sold $20 million face amount of 7.25% 1993 Notes on November 18, 1991 (*see,* Exhibit 83A);

2. defendant neither owned nor sold $22 million face amount of 7.75% 1995 Notes on November 18, 1991 (*see,* Exhibit 84A);

3. defendant did not purchase $22 million face amount of 7.75% 1995 Notes on November 12, 1991 (*see,* Exhibit 84B);

4. defendant neither owned nor sold $22 million face amount of 7.5% 1993 Notes on November 12, 1991 (*see,* Exhibit 84C);

5. defendant did not purchase $20 million face amount of 7.25% 1993 Notes on November 5, 1991 (*see,* Exhibit 83B);

6. defendant neither owned nor sold $21 million face amount of 7.375% 1996 Notes on November 5, 1991 (*see,* Exhibit 83C); and,

7. defendant neither owned nor sold $21 million face amount of 7.0% 1994 Notes on November 5, 1991 (*see,* Exhibit 83D).

On November 25, 1991, defendant was undergoing a bank examination. To dem-

onstrate to the examiners that its ITM trading account was liquid, defendant instructed Wymer to cash out its portfolio. Because defendant did not, in fact, own the Shearson Notes it ostensibly bought on November 18, 1991, Wymer covered the shortfall in defendant's trading account by misappropriating Iowa Trust's 1995 Notes and converting them into the 1994 Notes, which he wire-transferred into defendant's account with Refco Securities. Therefore, I find that the notes sold to Refco Securities on November 25, 1991, the proceeds of which went to defendant, were the 1994 Notes wire-transferred from FIB on that date and not the Shearson Notes wire-transferred to Refco Securities from Shearson on November 18, 1991.

Nevertheless, defendant claims that the November 18, 1991 fedline wire transfer evidencing transfer of the Shearson Notes to Refco Securities proves its claim to these notes because its name is listed on that document as the recipient sub-account within Refco Securities. However, Wymer was defendant's agent. His oral instructions to Refco Securities to place the incoming notes into the State of Wyoming account superseded any instructions on the in-coming wire. Further, I find from the testimony of representatives of Refco Securities and its clearing agent, Manufacturers Hanover, that sub-account information would not necessarily be available on their computer screens.

Contrary to defendant's attack on the credibility of testimony and documents from Refco Securities, I find this evidence to be credible. The documents generated by Refco Securities are internally consistent and have matching tracer numbers. These documents are corroborated by reports and statements from independent sources, such as Manufacturers Hanover and FIB. Further, Robert Dantone's testimony that he acted on Wymer's instructions and placed the in-coming Shearson Notes into the State of Wyoming account is fully consistent with Wymer's *modus operandi* and the testimony of the broker-dealers who dealt with defendant's ITM trading account.

## II.

## CONCLUSIONS OF LAW

Because the parties are diverse, jurisdiction is proper under 28 U.S.C. § 1332. Defendant resides in the District of Colorado and, thus, venue is proper under 28 U.S.C. § 1391.

In this diversity action, I apply Colorado's substantive law of constructive trusts. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). A constructive trust is an equitable device used to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. *In re Marriage of Allen*, 724 P.2d 651, 656 (Colo.1986). "[A] constructive trust beneficiary may obtain, through tracing, not merely what was lost but also other property or profits traceable to that lost property." *Id.* at 657.

> When property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Page v. Clark*, 197 Colo. 306, 592 P.2d 792, 798 (1979).

Here, plaintiff has clearly traced Iowa Trust property, the 1995 Notes, from its account with Bankers Trust, through the sale of the 1995 Notes and the purchase of the 1994 Notes at FIB, to the eventual sale of the 1994 Notes and transfer of the sale proceeds to defendant. On the other hand, the evidence is equally clear that defendant neither purchased, bona fide or otherwise, the Shearson Notes for value on November 18 nor sold those notes to Refco Securities on November 25. Defendant would be unjustly enriched if it retained the funds Wymer misappropriated from the Iowa Trust. Equity demands that defendant return the property to its rightful owner, the Iowa Trust. Therefore, I conclude that plaintiff has more than met his burden of showing his entitlement to the relief sought here.

Defendant's expert witness, Lee Pickard, opined that legal title to the Shearson

Notes vested in defendant on November 18, 1991, apparently as a donee, even though Refco Securities credited those notes to the State of Wyoming account at Wymer's direction and even though defendant paid nothing for them. Pickard testified that Refco Securities had a fiduciary obligation to hold the notes for defendant and, therefore, defendant is entitled to the funds wire-transferred to it on November 25, 1991.

First, Pickard's testimony lacks credibility. More importantly, defendant misses the point. This is an action in equity. Legal title notwithstanding, the very function of a constructive trust is to pierce the "legal" facade to do equity under the circumstances. Here, defendant paid nothing for the Shearson Notes and those notes were bought outright by Refco Securities on November 22, 1991. It would be inequitable for defendant to be unjustly enriched by receiving the proceeds from the sale of notes that it did not buy. *See, In re Marriage of Allen*, 724 P.2d at 659 ("A constructive trust ... can be imposed on the product of wrongfully obtained property even when that product has been transferred to an innocent donee"). And, I have already found as a matter of fact that funds wire-transferred to defendant on November 25, 1991 resulted from the sale of the 1994 Notes and not the Shearson Notes.

Defendant also argues that (1) a constructive trust cannot be imposed where the subject property is fungible or has been commingled, (2) a constructive trust cannot be imposed on a bona fide purchaser, and (3) plaintiff abandoned its title under UCC § 8–301(1) to the 1995 Notes when it transferred them under an alleged reverse repurchase agreement. None of these arguments have merit.

A constructive trust need not apply to a specific *res*. Rather, a successful constructive trust plaintiff wins an *in personam* judgment requiring the defendant to transfer a like value of property in some form to plaintiff. *In re Marriage of Allen*, 724 P.2d at 657. Here, plaintiff has clearly traced the proceeds from Wymer's sale of Iowa Trust's 1995 Notes to defendant. Thus, defendant received cash belonging to the Iowa Trust and the final judgment in this action merely requires defendant to reconvey a like amount of cash to plaintiff. The constructive trust doctrine simply does not require that the subject property be the same and, therefore, it is irrelevant that the property is fungible or commingled. *Id.*

Although a constructive trust cannot be imposed on a bona fide purchaser for value, *see, In re Marriage of Allen*, 724 P.2d at 657, as a matter of fact and law, defendant is not a purchaser, bona fide or otherwise. Defendant paid no consideration for the 1994 Notes transferred into Refco Securities on November 25 from FIB or, for that matter, the Shearson Notes transferred into Refco Securities on November 18 from Shearson.

Colorado law is clear that a constructive trust can be imposed on a defendant who has legal title to the subject property, even when that defendant is innocent of any wrongdoing. *See, Page*, 592 P.2d at 798. Even assuming defendant's legal title in the subject property, as a matter of law, the Uniform Commercial Code finds no relevant application to this case.

Next, plaintiff did not willfully transfer the 1995 Notes to a third party as alleged by defendant. Rather, Wymer misappropriated plaintiff's property to cover the shortfall in defendant's ITM trading account. Thus, the evidence does not support defendant's affirmative defenses of estoppel and unclean hands.

Lastly, there is the question of statutory interest in a constructive trust action. The beneficiary of a constructive trust can recover the value of the original *res* and any profits traceable to that *res*. *In re Marriage of Allen*, 724 P.2d at 657. However, where, as here, the constructive trustee is merely "an innocent donee," it "is liable only to the extent to which [it] is unjustly enriched...." *Id.* at 660. Thus, a constructive trust award may not include statutory interest because to do so would

provide a windfall to the beneficiary of the constructive trust at the expense of the innocent donee.

I have found that plaintiff did not prove the amount of profits, if any, defendant made by trading with Iowa Trust funds between November 25, 1991 and January 22, 1992. This finding renders moot any claim defendant may have for set-off for any "improvement" it may have made to the *res*. Further, the amount of funds segregated into the escrow account should have been only the $42,843,614.13 *res* rather than the $43,173,614.13 actually deposited (a difference of $330,000). Plaintiff, of course, is entitled to profits made on the former amount while the funds were in the escrow account. Consequently, defendant is entitled to a refund of $330,000, plus .76% of the profits generated by the escrow account ($330,000 ÷ $43,173,614.13 × 100).

Accordingly, IT IS ORDERED THAT:

(1) Defendant Jefferson Bank & Trust holds $42,843,614.13 in constructive trust for plaintiff;

(2) The preliminary injunction is made final and permanent;

(3) Norwest Bank of Denver (formerly United Bank of Denver) shall immediately:

(a) liquidate all securities held by it pursuant to the escrow agreement dated January 23, 1992;

(b) deliver $330,000, plus .76% of the profits generated by the escrow account, to defendant Jefferson Bank & Trust;

(c) deliver all other resulting escrow funds to plaintiff by wire-transfer to ABA # 0730–00545 (Firstar Bank–Des Moines, Iowa, attn: Lisa Chavez) for the benefit of account # 004–003–0 (account of the Iowa Trust Receivership);

(d) terminate the escrow agreement dated January 23, 1992;

(4) Plaintiff shall have his costs; and,

(5) The judgment shall be STAYED for ten days. Upon further order of the court, the stay may be lifted or extended.

## APPENDIX 1
# TRANSACTIONS
# November 25, 1991